## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### AT BECKLEY

NANCY REUSCHEL, *as Executrix*
*of the Estate of* LOUISE MCGRAW,
*deceased*; LORETTA HOLCOMB,
*as Executrix of the Estate of* CHARLOTTE
ROGERS, *deceased*; and on behalf of all
others similarly situated,

      Plaintiffs,

v.                                                                Civil Action No.: 16-C-698
                Judge H.L. Kirkpatrick
                CLASS REPRESENTATION

CHANCELLOR SENIOR MANAGEMENT, LTD.

      Defendant.

### SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs, LOUISE MCGRAW, by and through her daughter NANCY REUSCHEL as power of attorney; and CHARLOTTE ROGERS, by and through her daughter LORETTA HOLCOMB as power of attorney, on their own behalf and all similarly situated sue the Defendant, CHANCELLOR SENIOR MANAGEMENT, LTD., in this First Amended Class Action Complaint and allege as follows:

### PARTIES, JURISDICTION AND VENUE

1. Plaintiff Louise McGraw ("McGraw") resides in an assisted living facility in the Greystone Senior Management Community owned, operated, controlled and managed by Defendant Chancellor Senior Management, Ltd., and located in Raleigh County, West Virginia.

2.     Plaintiff, Charlotte Rogers ("Rogers") (together with Louise McGraw "Plaintiffs" herein) currently resides in Raleigh County, West Virginia, and was a resident of The Greystone Inn in July and August 2014.

3.     This Court has jurisdiction because the amount in controversy exceeds $27500.00.

4.     At all times material hereto, CHANCELLOR SENIOR MANAGEMENT, LTD, ("Chancellor") owned, operated, managed and controlled four senior living communities in the State of West Virginia consisting of multiple assisted living facilities: the Greystone Senior Living Community of Beckley, the Wyngate Senior Living Community of Parkersburg, the Wyngate Senior Living Community of Barbersville and the Wyngate Senior Living Community of Weirton. Operations of all of Chancellor's assisted living facilities in West Virginia are conducted under a single umbrella. The practices, policies, and procedures of Chancellor's assisted living facilities are established, implemented, and monitored by a single management team from Chancellor Senior Management, LTD.'s corporate office in Columbus, Ohio.

5.     The documents, forms, data and software related to the admission, pricing, assessment, and staffing at all Chancellor assisted living facilities are identical and were developed and implemented and dictated by the Chancellor corporate office in Columbus, Ohio.

6.     Chancellor's West Virginia assisted living facilities are not permitted to establish separate practices, policies, and procedures for admission, pricing, assessment of resident and staffing; but instead use practices, policies, and procedures established and dictated by or on behalf of Chancellor from its Columbus, Ohio corporate office.

7.     At all times material to this action, Chancellor's assisted living facilities in West Virginia have held themselves out to the public, to their residents and families, to state regulatory agencies, and to the community as a single organization: "Chancellor."

8.      Chancellor has reaped the financial benefits of operating, managing and maintaining its assisted living facilities in West Virginia at all times material to this action. Chancellor Senior Management, LTD., may be served with Notice of Process by and through Roetzel & Andress, 155 East Broad Street, 12th Floor, Columbus, OH 43215.

9.      This is a class action for declaratory, injunctive and monetary relief pursuant to West Virginia Rule of Civil Procedure 23.

10.     All conditions precedent to the bringing of this action have either occurred or have been excused by the Defendant. Specifically, in compliance with West Virginia Code § 46A-6-106, on October 26, 2016, Plaintiffs perfected notice to Chancellor Senior Management, LTD. of its violations of West Virginia's Unfair Insurance Practices Act and Consumer Credit and Protection Act as alleged herein by Certified Mail Return Receipt Requested. Chancellor accepted service of the October 26, 2016 letter as of November 7, 2016 through its counsel, Susan R. Snowden, and more than 10 days have passed since service was accepted.

## NATURE OF THE CASE

11.     This is a class action for monetary damages, declaratory and injunctive relief and penalties to redress systemic unfair and deceptive trade practices and breaches Chancellor has committed against residents of the assisted living facilities Chancellor owns, operates, manages and controls in West Virginia in violation of West Virginia law. Chancellor has engaged in a scheme to defraud seniors, persons with disabilities and their family members by making misrepresentations, misleading statements, and concealing material facts such that reasonable consumers are misled and reasonably expect that Chancellor uses a Resident Assessment System to assess residents' needs and to determine and provide staffing at its assisted living facilities. This is false and misleading because Chancellor does not use the results generated by its "Resident

Assessment" system to determine or provide staffing at its facilities. On the contrary, as a matter of corporate policy and standard operating procedure, Chancellor staffs its facilities based on pre-determined labor budgets designed to meet corporate profit objectives and routinely and systematically fails to staff its facilities in a manner sufficient to meet the assessed needs of its resident populations. Chancellor failed to disclose and concealed this fact from the Plaintiffs and the members of the putative Class.

## **GENERAL ALLEGATIONS**

12.    Assisted living facilities are non-medical facilities that offer room, board and daily assistance for seniors in certain activities of daily living such as meal preparation, shopping, transportation, preparing and taking medication, using the telephone, dressing, paying bills, and housekeeping among other matters.

13.    Assisted living facilities are intended to provide a level of care appropriate for those who are unable to live by themselves, but who do not have medical conditions requiring more extensive nursing care and significant assistance with most of their activities of daily living. Chancellor's assisted living facilities also have "memory care units," which serve individuals with dementia and other cognitive disorders.

14.    In recent years, Chancellor has increasingly been accepting and retaining more residents with conditions and care needs that were once handled almost exclusively in skilled nursing facilities. This has allowed it to increase not only the potential resident pool but also the amounts of money charged to residents and/or their family members.

15.    At Chancellor facilities, residents are charged a base rate plus additional charges based on their assessed personal care needs. Thus, the greater the assessed needs determined by Chancellor for a resident, the more money Chancellor charges that resident.

16.     In addition, Chancellor also routinely charges a "Community Fee" as part of the admission agreement which the resident must pay prior to admission. Plaintiff and Class Members have paid Community Fees based on the reasonable expectation that Chancellor would staff its facilities to meet the collective assessed needs of each facilities' residents.

17.     At Chancellor's direction, its facilities are required to conduct initial resident assessments to determine each resident's care needs. Chancellor assigns "points" to each need identified by the assessment which correlates to the number of staffing minutes required to meet that need. Chancellor's assessment tool then totals the number of staffing minutes required to meet all of the resident's needs. Based on the total number of staffing minutes calculated, the assessment tool assigns the resident to a "level of care" which drives the monthly price the resident must pay to reside in the facility.

18.     Chancellor assures residents that:

> [t]he levels of assistance and activity are determined by the interests and abilities of each resident. An individualized assistance and service plan is developed for each resident ...***We provide***...***as much care as needed***. (Emphasis added).

19.     Similarly Chancellor represents that its assisted Living facilities are "created to meet the needs of those suffering from physical, mental, and memory impairments or for those needing intense assistance to maintain a quality of life" and that they are "alert to these needs and address them accordingly."

20.     In form admission contracts entered into with each resident, Chancellor promises to provide the assistance required and specified by the resident assessment and which corresponds to that resident's assessed care needs. Chancellor bases its monthly charges for these "Personal Service and Care" needs on the staff time necessary to deliver those personal care services. The reasonable consumer expects that Chancellor will use its Resident Assessment System and the

Personal Care Plans generated by it, not only to charge for assessed level of care, but also to determine and actually provide staffing levels sufficient to deliver the level of care assessed by Chancellor and paid for by the resident. In addition, the reasonable consumer expects that Chancellor will have in place corporate policies and operating procedures that ensure that Chancellor secures the amount of staff time it has determined is necessary to meet the aggregate needs of Chancellor's residents as determined by the Resident Assessment System.

21.    In fact, Chancellor does not receive or use its Resident Assessments to determine or providing facility staffing budgets at the corporate level. Instead, Resident Assessments are retained by the facilities, and as a matter of corporate policy and standard operating procedure, Chancellor staffs its assisted living facilities based on labor budgets and profit goals determined at the corporate level; and Chancellor prohibits its facilities from making staffing decisions themselves to meet the assessed needs of their resident populations. As a result Chancellor fails to staff its facilities in a manner sufficient to meet the assessed needs of its residents. Chancellor did not disclose and affirmatively conceals these crucial and material facts from residents (including Plaintiffs), their family members and the consuming public.

22.    Chancellor's misrepresentations, misleading statements, and omissions are material to the reasonable consumer because seniors and/or their family members chose an "assisted" living facility because they *need* assistance, which is to be provided by the staff of that facility.

23.    It is a matter of fundamental importance to the reasonable consumer that Chancellor does not staff, and has no intention of staffing, its facilities based on the resident assessment numbers Chancellor has itself determined are necessary to provide the services for which it is charging its resident.

24.     If the named Plaintiffs had known the true facts about Chancellor's corporate policy of ignoring its Resident Assessment System and the Personal Service and Care Plans established by it to determine and provide facility staffing, they would not have agreed to enter Chancellor or to pay Chancellor significant amounts of money in up-front "Community Fees" and monthly "Personal Care" charges, or in all reasonable probability would have paid Chancellor less money.

25.     As a result of its profit-driven staffing policies and practices that fail to take residents' assessed needs into account, Chancellor systematically and routinely fails to staff its facilities in a manner sufficient to meet the assessed needs of its residents.

26.     This action seeks to require Defendants to disclose to prospective and current residents, their family members, and/or responsible parties that Chancellor does not use its Resident Assessment System or the aggregate Personal Service and Care Plans to set and provide staffing at its facilities. In addition to injunctive relief, this action seeks class-wide damages based on Defendants' misrepresentations, misleading statements and material omissions alleged herein. This action does not seek recovery for personal injuries, emotional distress or bodily harm that may have been caused by Defendants' conduct alleged herein.

27.     The practices challenged herein violate West Virginia's Consumer Credit and Protection Act, Chapter 46A. (The "Consumer Protection Act."), which provides a private right of action for unfair and deceptive acts that include the "act, use or employment by any person of any deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any goods or services," which includes assisted living services. The Act also prohibits:

- Engaging in any other conduct which "similarly creates a likelihood of confusion or of misunderstanding."

- "Advertising goods or services with intent not to sell them as advertised."

- "Representing that goods or services...have characteristics, ingredients, uses, benefits...that they do not have..."

- "Representing that goods or services are of a particular standard, quality or grade..."

28.     In enacting the Consumer Protection Act, the West Virginia Legislature declared that the purpose of Act is to complement the body of federal law governing unfair competition and unfair, deceptive and fraudulent acts or practices in order to protect the public and foster fair and honest competition. Additionally, the Legislature intended for the Act to be liberally construed so that its beneficial purposes may be served.

29.     Chancellor knows that its assisted living resident population is particularly vulnerable to the systemic failure to meet care needs. Despite these harsh realities Chancellor routinely and systemically targets this vulnerable population to charge them for care-need services it has no intention of meeting.

30.     Proof of Chancellor's unfair and deceptive practices, and the economic damage caused to Class Members can be proven objectively as to Plaintiffs and the Class by reference to Chancellor's own documents, electronic systems and information. Chancellor's records will document every occasion in which its facilities did not maintain staffing levels sufficient to meet its residents assessed needs. In every instance, each Class Member will have paid a Community Fee and Monthly Personal Care charges for care they did not receive, and these amounts can be

objectively determined by reference to Chancellor's documents, electronic systems and other information.

31.     Chancellor's staffing levels routinely and systemically violate West Virginia's regulations and statutes governing this issue. For example, West Virginia Alzheimer's Special Care Standards Act - 64 CSR 85-4.2 was passed to protect the public. The Rules implementing the act, 64 CSR 85, mandate minimum levels of care and staffing for facilities that hold themselves out as providing memory or dementia care. In deposition testimony given in an wrongful death case alleging that understaffing resulted in the death of Thomas William Knepp at the Greystone facility, Chancellor Senior Management's corporate nurse, Amy Lynn Wolfe admitted that the Greystone Inn and Chancellor Senior Management did not comply with 64 CSR 85-4.2 during Thomas Knepp's residency, despite the fact that he was admitted to Greystone for memory care services.

32.     The Greystone Inn and Chancellor Senior Management were repeatedly cited by the State of West Virginia for deficiencies that directly caused or contributed to Thomas Knepp's death including:

a.     Failing to have sufficient staff to meet the needs of the residents;

b.     Failing to properly supervise residents suffering from confusion;

c.     Failing to properly train staff on Alzheimer's and dementia;

d.     Failing to ensure, if a resident has an accident, an appropriately licensed health care professional is contacted to assess the severity and cause of the accident.

33.     This action will serve the purpose of correcting the wrongs of Chancellor Senior Management, LTD., and will provide relief for those affected by the improper conduct.

**Uniform Representations in Chancellor Standard Form Contracts**

34.    Defendant Chancellor represents to residents that it will use its Resident Assessment System to determine and then provide the level of care that Chancellor has itself decided is necessary to provide the services and care for which its residents are paying.

35.    Specifically, Chancellor makes the affirmative representation in each resident's uniform contract that, in addition to the "basic services" it provides in exchange for the monthly base rent, it evaluates each resident and provides additional "personal services" described in the resident's assessment and made part of a "Personal Service Plan":

> An initial Service Assessment and Personal Care Plan have been developed for you, a copy of which has been given to you. At the end of your first (30) days of residency, every ninety (90) days thereafter, or more frequently if your condition should change, we will meet with you and your family to review the appropriateness of your Personal Care Plan. Your Service Assessment will be reviewed by our staff every thirty (30) days. At each of these assessments, your Care Plan and Level of Care may be adjusted with a copy of the adjusted Care Plan provided to you.

36.    Based on the resident's "assessed care needs" Chancellor establishes a price for Personal Assistance and Care to meet needs related to 6 categories of care: (1) cognitive and psychosocial needs including wandering behaviors; (2) activities of daily living and physical functioning including bathroom and bathing needs; (3) mobility, transfer and escort including fall risks; (4) nutrition and dining including assistance with feeding; (5) health related services; and (6) laundry and housekeeping needs. Each of these categories is broken down in detail. For example, the category Activities of Daily Living is broken down to capture and charge for 10 specific bathing needs as shown on the assessment including: the need for bathing "set-up", the need for a "stand-by assist for showers"; and the need for "two person" shower assist.

37.    Chancellor assigns points to each assessed Personal Assistance and Care which correlates to the number of staffing minutes required to meet that particular need. Chancellor's

assessment tool then totals the number of staffing minutes required to meet all of the resident's needs. Based on the total number of staffing minutes calculated, the assessment tool assigns the resident to a "level of care" which drives the monthly price the resident must pay to reside in the facility. Pursuant to the form Resident Agreement, higher monthly Personal Care charges are imposed for higher care levels, and Chancellor agrees to provide the services necessary to meet these needs.

38.    Chancellor reinforces the misleading representation that its staffing will be based on resident needs through the use of its Resident Assessment System by promising to periodically re-evaluate residents' health to update the Personal Service Plan. If so, Chancellor's agreement states that it shall be entitled increases in the Personal Services Rate when a Personal Service Plan is amended because additional services are shown to be needed in an interim assessment.

39.    In addition, at various times during the Class Period, Chancellor has sent out standard letters notifying facility residents of rate increases. Among other things, these letters emphasize the increased costs of providing the residents' quality care, including staffing costs to "take care of your senior living needs." For example, in February 2015, Stefanie Compton, Director of the Greystone facility sent a letter to residents and/or their representatives detailing an upcoming increase in Personal Service Rates because Chancellor had "recognized the growing needs at Greystone" and was "making staffing additions to ensure that we maintain our excellence in care." On information and belief, Chancellor did not increase staffing levels despite the clear representation that it would do so.

40.    As a result of Chancellor' misrepresentations, misleading statements and material omissions alleged herein, reasonable consumers, including the named Plaintiffs, the putative Class and the general consuming public reasonably expect that Chancellor will use its Resident

Assessment System and the Personal Service Plans generated by it when determining and providing staffing levels. It is a matter of fundamental importance to the reasonable consumer that Chancellor does not staff and has no intention of staffing its facilities based on the resident assessment numbers Chancellor has itself determined are necessary to provide the services for which it is charging its residents.

**Chancellor's Marketing Materials**

41.    Through its corporate website, marketing brochures, scripted marketing presentations, and other standardized corporate-issued marketing materials, Chancellor reinforces the misrepresentations and misleading statements made in every contract that its assisted living facilities use Chancellor's Resident Assessment System and the Personal Service Plan levels of care generated by it to determine and provide the necessary levels of staffing.

42.    For example, Chancellor's website represents that its facilities are "to provide all the assistance residents may need." For those residents who "require assisted living services in a "smaller environment" Chancellor represents that it will meet these assessed needs by providing:

> additional staff support for those requiring a higher level of attention such as eating difficulties, behavioral issues (forgetfulness, confusion and short term memory loss), suffering from Parkinson's or related diseases. We're experienced in balancing the desire to live independently with the heightened requirements for personal safety. [W]e make every effort to ease your loved one into a comfortable and enjoyable lifestyle, ***offering individually tailored personal care options to perfectly suit their needs***.

43.    Chancellor represents that its assisted living facilities are "created to meet the needs of those suffering from physical, mental, and memory impairments or for those needing intense assistance to maintain a quality of life" and that they are "alert to these needs and address them accordingly."

44.    Chancellor repeats its misrepresentations and misleading statements when it conducts periodic re-assessments of residents and identifies additional personal care services

12

needed by the resident and increases the Level of Care fee charged to the resident. Routinely and systemically, despite price increases based on additional care needs, Chancellor does not increase staffing to meet these needs. Again, Chancellor does not disclose to the resident or their family members that Chancellor does not and will not increase its staff for that resident or facility to correspond to the increased Level of Care.

### Chancellor's Non-Disclosure and Concealment

45.     Contrary to the express and implied representations in its form contract and other uniform written statements, Chancellor does not use the Resident Assessment System or assessed Personal Service levels of care in setting or providing facility staffing, but instead determines staffing based on labor budgets designed to meet corporate profit objectives. Chancellor conceals these material facts from its residents, their family members and the general public.

46.     Chancellor has the capability to determine the exact facility staffing levels required to meet the aggregate personal care needs promised to residents. Through its Resident Assessment System Chancellor can easily calculate the amount and type of staff needed by the facility on any given shift based on the evaluated needs of residents.

47.     While Chancellor uses this Resident Assessment System to set and charge monthly rates, Chancellor intentionally does not use this software to staff its facilities. Instead, Chancellor staffs its facilities to meet strict pre-determined labor budgets that are designed to meet corporate profit goals, a fact it actively conceals from residents and their family members.

48.     Scott Shroyer, Director of Operations for Chancellor Senior Management LTD, also gave deposition testimony in the Thomas Knepp wrongful death case. Mr. Shroyer testified that Resident Assessments are individualized assessments that outline "the services that a customer would need." Thereafter, the "care the resident needs, is identified on the Resident Assessment

Service Plan"; and the Resident Assessment is the tool by which the "amount of money that the resident has to pay to stay at [the] facility."

49.     Mr. Shroyer further testified, however, that Resident Assessments are not obtained or considered by Chancellor's home office to establish the staffing budgets for Chancellor's facilities. Instead, Assessments are kept in each facilities' administrative office and the home office establishes staffing budgets by using occupancy projections based on past occupancy.

50.     Mr. Shroyer testified that Chancellor directs its facilities to staff based on strict budgets determined by corporate headquarters that are designed to meet profit objectives. Accordingly, facility directors are not permitted to increase their labor budgets to meet residents' assessed needs without approval from corporate headquarters. Mr. Shroyer offered an example of such a circumstance when a West Virginia facility asked for approval to hire a laundry helper because the care-giving staff could not get the laundry done. Mr. Shroyer explained that, pursuant to corporate policy, in addition to meeting the care needs of the resident population, hands-on care-giving aides are responsible for everyday housekeeping and laundry, and the request for additional staffing was denied by the home office.

51.     Chancellor's employee compensation policies encourage systemic understaffing of its facilities. Chancellor bases bonuses for management employees on their ability to meet profit and occupancy goals; and facility manager are discouraged from requesting staffing increases.

52.     As Mr. Shroyer testified, Chancellor's biggest expense is labor costs. Each facility's managers are eligible for bonuses only if the facility "exceeds budgeted net operating income" and the facility's management employees were not "a pain in the ass." When asked whether increasing staff at the facility level without approval from the home office would put the manager in the "pain in the ass" category, Mr. Shroyer answered "Yes."

14

53.     Chancellor is aware of the facts alleged above, but has not at any time disclosed those facts to residents or their family members. Nor has Defendant Chancellor issued new contracts to its resident that remove the Care Group charges, which are allegedly based on the staffing levels Chancellor has no intention to provide. In fact, Chancellor continues to charge residents and/or their family members for assessed levels of care it routinely and systemically does not provide.

### The Misrepresented and Concealed Facts Are Material

54.     Chancellor's misrepresentations and misleading statements and the facts they conceal are material to the reasonable consumer. As Chancellor acknowledges, an important and significant factor in choosing to move oneself or one's relative to a Chancellor facility is the provision of staffing to meet the needs the facility itself has determined is necessary to meet the aggregate assessed needs of facility residents.

55.     Chancellor's misrepresentations, misleading statements and omissions regarding Chancellor's provision of the amount of personal care time, i.e. staffing, that Chancellor has determined is necessary to meet resident care needs based on their assessed Care Group levels are material to prospective residents and their family members. Assurances that a facility will provide the amount of staffing the facility itself believes is necessary to meet the assessed needs of facility residents is a substantial factor (and indeed often the most important factor) in deciding to enter an assisted living facility.

56.     If Plaintiffs had known Chancellor did not and does not use its Resident Assessment System to set facility staffing levels even though these assessed needs drive the price paid by residents, Plaintiffs would not have entered a Chancellor facility, or they would have paid a lower price. Likewise, members of the putative Class would in all reasonable probability not have entered

Chancellor' facilities, or would have insisted upon a lower price, if they had known that Chancellor did not and does not use its Resident Assessment System to set staffing levels at its facilities.

57.    This is true even for residents who currently are practically independent. These residents choose an assisted living facility as opposed to remaining at home or moving into an independent living community because they wish to "age in place." They may not need significant assistance with the activities of daily living initially, but they expect to (and will) become more dependent as they age and do not want to move yet again when that happens.

58.    A key factor for these residents in selecting Chancellor is that the facility will provide the staffing that Chancellor itself has determined is necessary to meet their assessed needs, both now and as those needs, and corresponding Personal Service Plan levels of care increase.

59.    Chancellor has a duty to disclose to the consuming public that they do not use the Resident Assessment System or the Personal Service Plan levels of care generated by it to set aggregate staffing levels. Among other things, a substantial safety risk to current and future residents from Defendants' conduct exists, particularly because Chancellor serves a uniquely vulnerable population in need of assistance.

60.    Chancellor's non-disclosure is material because, among other things, Chancellor knows that their conduct risks the safety of their residents.

61.    Chancellor is fully aware of the facts alleged above. Yet, Chancellor has failed to disclose and actively concealed from residents, prospective residents and their family members the true facts about how staffing is set at Chancellor facilities.

62.    Chancellor's misrepresentations, misleading statements and material omissions affect not only the decision of residents to enter the facility but also the decision to stay at an Chancellor facility.

## FACTUAL ALLEGATIONS PERTAINING TO THE PLAINTIFFS

## LOUISE MCGRAW

63.    Louise McGraw has resided at the Greystone assisted living facility from March 27, 2013 to the present. When Ms. McGraw moved into Greystone, Chancellor provided her with a standard contract under which it promised to provide certain "basic services" in exchange for a monthly base rate. Chancellor initially charged Ms. McGraw a base rate of $1,527.00. Additionally, the contract stated that Chancellor would be responsible for providing additional "personal care services" Ms. McGraw would need as determined by the initial Resident Assessment and any subsequent determinations by Chancellor's staff that her level of care needs had changed. Chancellor initially charged $3,463 per month to meet the personal care needs identified by Chancellor's Resident Assessment System. In addition, based on the reasonable assumption that Chancellor would staff its facility in order to meet the care needs Chancellor identified, and charged for by using the Resident Assessment System, Ms. McGraw also paid a $2,900.00 "Membership/Community Fee in order to be admitted to Greystone.

64.    Chancellor failed to disclose and concealed from Ms. McGraw and her daughter that it does not use the resident evaluations to set staffing, but instead staffs its facilities based on profit margin. Ms. McGraw would not have agreed to enter Chancellor's Greystone facility, or would have paid less money, if they had known the true facts about Chancellor's services and the resident evaluation system.

65.    Since Ms. McGraw's admission, Greystone has routinely and systemically failed to staff Greystone in a manner to meet the assessed needs of its resident population, including Ms. McGraw.

66.     Prior to her admission, Ms. McGraw had fallen and broken her right hip. After surgery she spent time in rehabilitation before being transferred to Greystone for continuing care.

67.     Because Ms. McGraw had a private sitter when she was living at home, her children were particularly interested in making sure that she would receive adequate attention at Greystone. Prior to admission and several times thereafter, Chancellor represented to Ms. McGraw and her daughter that Chancellor would base personal care services on the assessed needs identified by the resident assessment which would have included a care giver checking on Ms. McGraw every 15 minutes.

68.     In reality, Chancellor staffed the entire Courtyard facility with only two assistants to meet the care needs of the entire facility. This level of staffing was inadequate to meet the assessed care needs of the resident population, including Ms. McGraw's. As a result in August 2013, Ms. McGraw fell and injured her right shoulder and had to be admitted to the hospital. Because Chancellor's staffing was inadequate to provide her level of care, Ms. McGraw paid for a private sitter to stay with her at Greystone, in addition to paying for the personal care services Chancellor had committed to provide.

69.     Since her admission, Chancellor's inadequate staffing has resulted in the following failures to meet her assessed needs among many others: being left alone in the dining room in her wheelchair for extended periods of time without supervision; being locked alone in her room without supervision, without her chair alarm attached and her calls for help ignored; being left in bed an entire day inconsistent with her Personal Service plan; and her nasal cannula being left on the dirty floor rather than being hung properly on the wall.

70.     In October 2015, two caregivers were transporting Ms. McGraw to the dining room in her wheelchair. They left her unattended in the hallway while they went into a room to get

another resident. Ms. McGraw fell to the floor and broke her left hip and shoulder requiring another

hip surgery while the shoulder was left to heal on its own. Ms. McGraw has steadily declined since

this fall, developing skin tears and bruises due to understaffing.

71.    Since May 2016, understaffing has resulted in Ms. McGraw not being bathed for

extended periods of time to the point that developed an odor and skin breakdowns. Understaffing

has also resulted in repeated dehydration.

72.    The care-giving staff at Greystone has told Ms. McGraw's daughters that they are

required to fulfill housekeeping duties in addition to the care of the residents along with having to

clean the kitchen. As a result, when they are cleaning a room or attending a resident at the end of

one hallway, they cannot hear a bed alarm or chair alarm at the end of the other hallway.

73.    Despite increases in the Personal Care Fees for Ms. McGraw on the representation

that these increases would result in additional staffing, Ms. McGraw's family has observed that

Chancellor staff does not spend any additional time with Ms. McGraw that would correspond to

her increasing needs. In fact, staffing has remained constant since her admission to Greystone.

## CHARLOTTE ROGERS

74.    Charlotte Rogers was admitted an assisted living facility in the Greystone Senior

Living Community on July 4, 2014. When Ms. Rogers moved into Greystone, Chancellor provided

her with a standard contract under which it promised to provide certain "basic services" as well as

for additional "personal care services" Chancellor's Resident Assessment System had determined

were needed. In addition, Ms. Rogers was required to pay a Membership/Community Fee in order

to be admitted. Ms. Rogers paid Chancellor the total amount of $10,091.00 for these charges up

front.

75.     Chancellor failed to disclose and concealed from Ms. Rogers and her daughter that it does not use the resident evaluations to set staffing, but instead staffs its facilities based on profit margin. Ms. Rogers would not have agreed to enter Chancellor's Greystone facility, or would have paid less money, if they had known the true facts about Chancellor's services and the resident evaluation system.

76.     Due to understaffing at Greystone, within just four days of her admission Ms. Rogers was hospitalized from July 8 to July 10, 2014 for dehydration. After her return to Greystone, between July 10 and July 27, 2014, she was again hospitalized two more times for IJTI, dehydration and malnutrition.

77.     At all material times, Chancellor failed to staff Greystone in a manner to meet the assessed needs of its resident population, including Ms. Rogers. As a result of Chancellor's understaffing in disregard for Ms. Rogers' assessed needs, upon her release from the hospital on July 27, 2014, Ms. Rogers was transferred away from Greystone.

## CLASS ACTION AND CLASS REPRESENTATION ALLEGATIONS

78.     The causes of action alleged herein, for declaratory and injunctive relief and for actual and treble damages are appropriate for class action treatment and class certification pursuant to the governing and applicable rules of civil procedure, including West Virginia Rules of Civil Procedure 23(b)(1)(a), 23(b)(2), 23(b)(3) and 23(c)(4).

79.     More specifically, this action is uniquely appropriate as a class action pursuant to Rule 23(b)(2), because Plaintiffs seek declaratory and injunctive relief for the entire Class arising out of a common course of conduct and actions undertaken by Chancellor Senior Living LTD., or failures to act, on grounds generally applicable to the Class as a whole.

80.    In addition to injunctive relief, this action seeks class-wide damages for Chancellor's routine and systemic deceptive business practices, misleading statements and omissions. This action is appropriate for class certification under Rule 23(b)(3) because the questions of law and fact common with respect to liability and damages as to Plaintiff and the Class far more than predominate over any issues affecting individual members of the Class. Resolution of these issues within a class action is the superior and manageable method to achieve fair and efficient adjudication of this controversy.

81.    This action does not seek recovery for personal injuries, emotional distress or bodily harm that may have been caused by misrepresentations and misleading statements made by Defendants or by inadequate staffing at Defendants' facilities.

82.    The entitlement of Plaintiff and the Class to the monetary and equitable relief sought will turn on application of readily identifiable and objectively determinable facts and standards that derive from data and documents maintained by or on behalf of Chancellor, including but not limited to, objective comparison of the assessed needs of Chancellor's resident facility populations to Chancellor's actual staffing levels at its facilities.

83.    Plaintiffs are members of the Class described in paragraph 85 below, and properly allege this claim on her own behalf, and on behalf of the Class Members who are similarly situated, against the Defendant.

84.    The members of the Class are readily identifiable from documents maintained by or on behalf of Chancellor, thus permitting any appropriate notice to the Class and convenient case management by the Court.

85.    Plaintiffs allege the cause of action below on their own behalf and on behalf of all individuals that entered any of the four assisted living communities alleged herein to be controlled

by Chancellor Senior Management, LTD after October 25, 2012 and whose Residency Agreement contained an arbitration provision adopting the Rules of the American Health Law Association ("AHLA") and required any person requesting arbitration to pay a filing fee to AHLA.

## NUMEROSITY

86.    The precise number of Class Members is presently unknown to Plaintiff. However, publicly available records show that in 2012 alone the State of West Virginia licensed 70 assisted living beds for the Greystone Inn facility, which is just one of the Greystone assisted living facilities; 60 beds for the Inn at Wyngate, 65 beds for Wyngate Senior Living Community of Parkersburg, and 80 beds for Wyngate of Weirton. It is expected that the number of Class Members will total in the many hundreds, if not thousands.

87.    Joinder of the members of either the Class would also be contrary to the efficient use of scarce judicial resources, contrary to the public good and inconsistent with the orderly and efficient administration of civil justice between and among civil litigants.

88.    The number of Class Members will be easily ascertained through discovery of Chancellor's records prior to certification of the class. Issues related to class certification will be easily determined by utilizing Chancellor's electronic databases and systems, as well as other public information readily available.

## COMMONALITY

89.    This overriding claim presented by Plaintiff and the Glass is founded on the question of whether Chancellor's policy, practice and common course of conduct of charging its residents based on their assessed needs as determined by Chancellor's Resident Assessment System while utterly disregarding these assessed needs in staffing its facilities, and instead staffing based on corporate profit goals constitutes an unfair or deceptive trade practice, violates applicable

statutes and violates public policy. This overriding claim raises the following common issues of fact and law:

(a)     whether Chancellor has violated and continues to violate the West Virginia Consumer Credit and Protection Act, Chapter 46A, by making false and misleading statements that its assisted living care services are of a particular standard, quality or grade designed to meet the assessed care needs of its residents when, in fact, its assisting living care services are actually based on corporate profit goals, do not consider the assessed needs of its residents and do not meet the standard, quality or grade of service represented by Chancellor;

(b)     whether Chancellor has violated and continues to violate the Consumer Protection Act by representing that its resident admission agreements confer the right to services to meet resident's assessed care needs when the actual services provided by Chancellor do not involve, or even consider the assessed needs of its resident populations;

(c)     whether Chancellor's unfair and deceptive practices described herein proximately caused economic injury to Plaintiffs and Class Members;

(d)     whether by making the misrepresentations, misleading statements and material omissions alleged in this Complaint, Defendants have violated and continue to violate the Consumer Protection Act;

(e)     whether Chancellor has failed to disclose and concealed from Plaintiffs and the Class that it staffs Chancellor facilities based on corporate profit goals and without regard to the results of its Resident Assessment System;

(f)    whether the fact that Chancellor staff its facilities based on profit goals as opposed to the results of the residents' assessments is material, and whether Chancellor had and has a duty to disclose the foregoing concealment and omission;

(g)    whether Plaintiffs the Class and the consuming public were likely to be deceived by the foregoing concealment and omission;

(h)    whether Plaintiffs, the Class and the consuming public have a reasonable expectation that Defendants will use the Resident Assessment System and the Levels of Care generated by it to determine and provide staffing at facilities and, among other charges, paid Community Fees based upon this reasonable expectation;

(i)    whether Plaintiffs and the members of the Class are entitled to damages, and the nature of such damages; and,

(j)    whether Plaintiffs and the Class are entitled to declaratory and injunctive relief and/or other relief, and the nature of such relief.

## TYPICALITY

90.    The class claim asserted herein by Plaintiffs are typical of the claim possessed by each Class Member and is capable of being asserted by each Class Member against the Defendants.

91.    The claims of the Named Plaintiffs are typical of the claims of the Class. As alleged above, Chancellor made false and misleading statements and material omissions to Plaintiffs and the Class and/or their family members which gave rise to a reasonable expectation on their part that Chancellor uses its Resident Assessment System and the Levels of Care generated by it when determining staffing levels at its Chancellor facilities. The Resident Assessment System allows Chancellor to determine and provide the aggregate staffing Chancellor has determined is necessary

24

to meet the assessed needs of the residents, but in fact Chancellor does not use this critical information in budgeting for or employing staff at their West Virginia Chancellor facilities.

92.     Further, as alleged above, Chancellor has failed to disclose and concealed these material facts from the Plaintiffs and the Class. Plaintiffs' claims are typical of the claims of the proposed Class in the following ways:

1)      Plaintiffs are members of the proposed Class;

2)      Plaintiffs' claims arise from the same uniform corporate policies, procedures, practices and course of conduct on the part of Chancellor;

3)      Plaintiffs' claims are based on the same legal and remedial theories as those of the proposed Class and involve similar factual circumstances;

4)      the economic damage suffered by the Named Plaintiffs is similar to the economic damage suffered by the proposed members of the putative Class; and

5)      Plaintiffs seek a common form of relief for herself and the members of the Class.

**FAIR AND ADEQUATE REPRESENTATION OF THE CLASS**

93.     The named Plaintiffs have a true stake in this case and will fairly and adequately represent, protect, and prosecute the interests of each Class Member. Each of the powers of attorney for the named Plaintiffs are dedicated daughters that care deeply about the quality and level of care their mothers receive. Each has witnessed Chancellor's gross, systemic understaffing practices and is motivated to bring about a change in these practices.

94.     The named Plaintiffs' powers of attorney are capable of fairly representing the interest of their mothers and the Class Members who have been similarly impacted. Furthermore,

through their powers of attorney, Plaintiffs have engaged competent counsel knowledgeable in class actions and litigation of consumer issues.

95.    Plaintiffs have no interests actually or potentially adverse to those of the putative Class Members. Due to the alignment of interests, the named Plaintiffs will also ensure the same degree of prosecution of the commonly held claims of the Class Members.

**PREDOMINANCE**

96.    With respect to Plaintiffs' claims under the Consumer Protection Act class certification is appropriate under West Virginia Rule of Civil Procedure 23(b)(3) because questions of law or fact common to Class members predominate over any questions affecting only individual members of the proposed Class.

**SPECIFIC PROVISIONS UNDER RULE 23**
**UNDER WHICH CERTIFICATION IS SOUGHT**

**RULE 23(b)(1)**

97.    Given the nature of the Class claims for declaratory and injunctive relief and monetary damages, separate actions by each individual class member creates a very real risk of inconsistent and varying adjudications. Inconsistent results from different trial courts would provide incompatible and differing signals as to ongoing conduct by Chancellor related to its assisted living facilities.

98.    Differing rulings from different trial courts interpreting whether Chancellor's business practices related to resident assessments and staffing are deceptive or unfair would not lend themselves to certainty in conduct for the Plaintiffs, for Class Members, or for Chancellor.

99.    If the proposed class claims are litigated separately, Plaintiffs and the individual Class Members run the risk of being bound by an adverse ruling, which might become dispositive

26

of the interests of the individual Class Members or would be used as an argument to impede individual claims.

## RULE 23(b)(2)

100.    Chancellor Senior Management LTD., has acted or refused to act on grounds or in a manner generally applicable to all Members of the Class. Judicial economy is served by concentrating the litigation and resolving this question in a single action.

101.    The resident assessment programs and staffing standards dictated and utilized by Chancellor are uniform throughout its assisted living facilities, thereby making declaratory and injunctive relief appropriate to the Class as a whole.

102.    Plaintiff, for herself and members of the Class is seeking to correct a pervasive and ongoing wrong committed by Chancellor in a manner that will allow a definite and binding resolution that does not require continual re-litigation of the same issues in individual lawsuits. This will result in a benefit to all involved.

103.    Plaintiffs seek declaratory and injunctive relief requiring Chancellor to stop the intentional practice of staffing its facilities based on corporate profit goals rather than resident's assessed needs. Plaintiffs also seek injunctive relief requiring the Defendants to disgorge Community Fees paid by residents to gain admission to Chancellor's facilities upon the reasonable expectation that Chancellor would staff its facilities based on the collective assessed needs of a facilities resident population rather than based on corporate profit goals.

## RULE 23(b)(3)

104.    The questions of fact and law that are common to the Plaintiff and Class Members include the common issues identified in paragraph 89 above.

105.    The issues common the Class predominate. The defined Class avoids individualized determinations the Class is comprised of all residents of Chancellor assisted living facilities in during the class period, a fact which can be objectively determined by reference to Chancellor's own books and records.

106.    The damages sought on behalf of the Class also avoid individualized determinations in that Plaintiffs will seek disgorgement of Community Fees paid by Class Members, amounts which can be objectively determined by reference to Chancellor's own books and records.

107.    A class action is superior to other methods for fairly and efficiently adjudicating this controversy. Absent a ruling from this Court with class-wide implications, Chancellor will continue its unfair and deceptive patterns and practices.

**RULE 23(c)(4)**

108.    Alternatively, should this Court decline to certify the Class, this Court may certify a class for the purpose of resolving the question of liability, and the legality of the complained-of conduct, and thereafter proceed to address damages on a manageable individual basis.

**COUNT I**
**VIOLATIONS OF THE CONSUMER PROTECTION ACT**

109.    Plaintiff incorporates the allegations set forth in Paragraphs 1 through 108 of this Complaint as if fully set forth herein.

110.    The actions of Chancellor Senior Management LTD., amount to unfair or deceptive acts and practices in the business of providing assisted living services and constitute statutory violations.

111.    Chancellor knew and/or recklessly disregarded the fact that its intentional pattern and practice of practice of staffing its facilities based on corporate profit goals rather than resident's assessed needs constituted unfair or deceptive acts and practices;

112.    Defendant Chancellor's conduct was and is in direct violation of numerous statutory provisions including of the Consumer Protection Statute, West Virginia Code Chapter 46A including, but not limited to, the following violations:

- Engaging in conduct which creates a likelihood of confusion or of misunderstanding.

- Advertising goods or services with intent not to sell them as advertised.

- Representing that goods or services...have characteristics, ingredients, uses, benefits...that they do not have…

- Representing that goods or services are of a particular standard, quality or grade...

113.    As a direct and proximate result of these actions, Chancellor has caused Plaintiffs to suffer economic loss, attorneys' fees, costs, and expenses.

WHEREFORE, Plaintiffs pray for judgment against Chancellor Senior Management LTD., as follows:

114.    A declaration that Chancellor's systemic and routine business practice of staffing its assisted living facilities based on corporate profit goals rather than resident's assessed needs constitutes unfair or deceptive acts and practices in violation of the West Virginia Consumer Protection Statute Chapter 46A.

115.    Enjoining Chancellor from engaging in the practice of staffing its assisted living facilities based on corporate profit goals rather than resident's assessed needs.

116.    Compensatory damages consisting of Community Fees, and Personal Care Need Fee overpayments that Chancellor charged in connections with understaffing resulting from the deceptive practice alleged herein, along with interest on those amounts.

117.    Such other relief and damages the Court may deem just and proper, including but not limited to restitution and civil penalties; and

118.    An award of costs and attorney's fees made necessary by seeking this relief.

<h3 style="text-align:center">DEMAND FOR JURY TRIAL</h3>

Plaintiffs, for themselves and on behalf of all Class Members, demands trial by jury of all matters so triable.

Respectfully submitted,

/s/*Jonathan R. Mani*
Jonathan R. Mani, Esquire (WV Bar # 8824)
MANI, ELLIS & LAYNE, PLLC
P.O. Box 1266
Charleston, WV 25325
(304) 720-1000
Facsimile: (304) 720-1001