**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**AT BECKLEY**

NANCY REUSCHEL *as*
*Executrix of the Estate of*
Louise McGraw, *deceased*; and
LORETTA HOLCOMB *as*
*Executrix of the Estate of*
Charlotte Rodgers, *deceased*; and
on behalf of all others similarly situated,

       Plaintiffs,

v.                               CIVIL ACTION NO.  5:22-cv-00279

CHANCELLOR SENIOR MANAGEMENT, LTD.,

       Defendant.

**MEMORANDUM OPINION AND ORDER**

      Pending is Plaintiffs' Renewed Motion for Class Certification [ECF 275], filed August 15, 2024. On August 30, 2024, Defendant Chancellor Senior Management, Ltd. ("CSM") responded in opposition [ECF 291], to which Plaintiffs replied [ECF 293] on September 5, 2024.

**I.**

      Despite over 100 allegations, this action is quite readily summed up by paragraph 29 of the operative pleading: "[CSM] knows that its assisted living resident population is particularly vulnerable to the systemic failure to meet care needs. Despite these harsh realities Chancellor routinely and systemically targets this vulnerable population to charge them for care-need services it has no intention of meeting." [ECF 57 ¶ 29].  With this proof objective raised to

its paramount status -- and the operative pleading stripped of any window dressing -- the proposed class action does not satisfy *Federal Rule of Civil Procedure* 23.

## II.

On October 25, 2016, Plaintiffs, acting as executrices of their decedent mothers' estates, instituted this action on behalf of, Louise McGraw, Charlotte Rodgers, and others similar situated, in the Circuit Court of Raleigh County.  [ECF 1-1].  On July 7, 2022, following extensive state litigation, CSM removed. It asserts the jurisdictional amount exceeds the $5 million threshold prescribed by the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2).  [ECF 1 at 5-8].

Plaintiffs' Second Amended Class Action Complaint ("Complaint") alleges CSM owns, operates, controls, and manages four senior assisted living facilities in West Virginia, namely, (1) the Greystone Senior Living Community of Beckley, (2) the Wyngate Senior Living Community of Parkersburg, (3) the Wyngate Senior Living Community of Barboursville, and (4) the Wyngate Senior Living Community of Weirton.  [ECF 57 ¶ 4].  Decedents Ms. McGraw and Ms. Rodgers resided in the Greystone Senior Living Community ("Greystone"). Plaintiffs allege Greystone's staffing shortages resulted in the decedents' inadequate care.  [*Id.* at ¶¶ 63-77].

Plaintiffs allege CSM misrepresents facility staffing needs based upon a "Resident Assessment System;" they assert Greystone instead "staffs its facilities based on pre-determined labor budgets designed to meet corporate profit objectives and routinely and systematically fails to staff its facilities in a manner sufficient to meet the assessed needs of its resident populations." [*Id.* at ¶ 11].  Plaintiffs contend this is an "unfair and deceptive trade practice" and "a scheme to defraud seniors, persons with disabilities and their family members by making misrepresentations, misleading statements, and concealing material facts such that reasonable consumers are misled."

[*Id.*]  Plaintiffs contend they and others have thus overpaid for services "based on the reasonable expectation that [CSM] would staff its facilities to meet the collective assessed needs of each facilities' [*sic*] residents."  [*Id.* at ¶ 16].

A complete understanding of the analysis is aided by in-depth scrutiny of the Second Amended Complaint. Near the outset of that lengthy pleading, Plaintiffs nominally allege a multipronged, active and passive fraud:

> Chancellor has engaged in a scheme to defraud seniors, persons with disabilities and their family members by *making misrepresentations, misleading statements, and concealing material facts* such that reasonable consumers are misled and reasonably expect that Chancellor uses a Resident Assessment System to assess residents' needs and to determine and provide staffing at its assisted living facilities. This is false and misleading because Chancellor does not use the results generated by its "Resident Assessment" system to determine or provide staffing at its facilities. On the contrary, as a matter of corporate policy and standard operating procedure, Chancellor staffs its facilities based on pre-determined labor budgets designed to meet corporate profit objectives and routinely and systematically fails to staff its facilities in a manner sufficient to meet the assessed needs of its resident populations. Chancellor failed to disclose and concealed this fact from the Plaintiffs and the members of the putative Class.

[*Id.* at ¶ 11 (emphasis added)]. This allegation explicitly asserts theories grounded in active misrepresentation on the one hand and, on the other, passive omission and concealment.

Further within the operative pleading, there are multiple, detailed allegations of active fraud and misrepresentation:

> 18. *Chancellor assures residents* that:
>
> > [t]he levels of assistance and activity are determined by the interests and abilities of each resident. An individualized assistance and service plan is developed for each resident ...We provide...as much care as needed. (Emphasis added).
>
> 19.  Similarly *Chancellor represents* that its assisted Living facilities are "created to meet the needs of those suffering from physical, mental, and memory impairments or for those needing intense assistance to maintain a quality of life" and that they are "alert to these needs and address them accordingly."

20. *In form admission contracts* entered into with each resident, *Chancellor promises* to provide the assistance required and specified by the resident assessment and which corresponds to that resident's assessed care needs. . . .

21. In fact, Chancellor does not receive or use its Resident Assessments to determine or providing facility staffing budgets at the corporate level. Instead, Resident Assessments are retained by the facilities, and as a matter of corporate policy and standard operating procedure, Chancellor staffs its assisted living facilities based on labor budgets and profit goals determined at the corporate level; and Chancellor prohibits its facilities from making staffing decisions themselves to meet the assessed needs of their resident populations. As a result Chancellor fails to staff its facilities in a manner sufficient to meet the assessed needs of its residents. *Chancellor did not disclose and affirmatively conceals these crucial and material facts from residents (including Plaintiffs), their family members and the consuming public.*

22. *Chancellor's misrepresentations, misleading statements, and omissions are material to the reasonable consumer because seniors and/or their family members chose an "assisted" living facility because they need assistance, which is to be provided by the staff of that facility.*

. . . .

34. *Defendant Chancellor represents to residents* that it will use its Resident Assessment System to determine and then provide the level of care that Chancellor has itself decided is necessary to provide the services and care for which its residents are paying.

35. Specifically, *Chancellor makes the affirmative representation in each resident's uniform contract* that, in addition to the "basic services" it provides in exchange for the monthly base rent, it evaluates each resident and provides additional "personal services" described in the resident's assessment and made part of a "Personal Service Plan" . . . .

. . . .

38. Chancellor reinforces *the misleading representation* that its staffing will be based on resident needs through the use of its Resident Assessment System by promising to periodically re-evaluate residents' health to update the Personal Service Plan. . . .

39. In addition, at various times during the Class Period, Chancellor has *sent out standard letters notifying facility residents of rate increases*. Among other things, these letters emphasize the increased costs of providing the residents' quality care, including staffing costs to "take care of your senior living needs." For example, in February 2015, Stefanie Compton, Director of the Greystone facility sent a letter to

residents and/or their representatives detailing an upcoming increase in Personal Service Rates because Chancellor had "recognized the growing needs at Greystone" and was "making staffing additions to ensure that we maintain our excellence in care." *On information and belief, Chancellor did not increase staffing levels despite the clear representation that it would do so.*

[*Id.* at ¶¶ 18-22, 34-35, 38-39]. There is a litany of additional allegations to the same effect. It is apparent the gravamen of the action rests upon Chancellor's alleged intentional misrepresentations.[1]

When Plaintiffs reach the point in their operative pleading where they begin to recite their allegations of "Non-Disclosure and Concealment," one point is abundantly clear: What Plaintiffs cast as "omissions" or "concealments" are, instead, simply the Chancellor practices occurring in the background that demonstrate the falsity of its active misrepresentations alleged earlier. The following two allegations suitably demonstrate Plaintiffs' attempt to shoehorn multiple, active misrepresentations into a putative claim for a passive fraud:

45. *Contrary to the express and implied representations in its form contract and other uniform written statements*, Chancellor does not use the Resident Assessment

---

[1] Plaintiffs were quite clear about their intentions while in state court in 2017. Their Memorandum of Law in Opposition to Defendant's Motion For Judgment on the Pleadings, or in the alternative, Motion for Summary Judgment, provides as follows:

Despite representing to its residents that the amount of care will be determined by the Resident Assessment System, Chancellor does not disclose to its residents that the staffing levels in its facilities are, in fact, not determined by these Resident Assessments. Instead, Chancellor staffs its facilities based on pre-determined labor budgets designed to meet corporate profit objectives. This practice routinely and systematically results in Chancellor's failure to staff its facilities in a manner sufficient to meet the assessed needs of its resident populations. *Chancellor concealed this fact from the Plaintiffs and the members of the putative class. This concealment amounts to a material misrepresentation* because the critical benefit Plaintiffs believed they would receive by purchasing the offered services from the Defendant was adequate and appropriate care from Defendant's nursing and caregiving staff. These practices violate West Virginia's Consumer Credit and Protection Act, Chapter 46A, which provides a private right of action for unfair and deceptive acts.

[ECF 287-3 at 3 (emphasis added)].

System or assessed Personal Service levels of care in setting or providing facility staffing, but instead determines staffing based on labor budgets designed to meet corporate profit objectives. *Chancellor conceals these material facts from its residents, their family members and the general public.*

. . . .

53. Chancellor is aware of the facts alleged above, but has not at any time disclosed those facts to residents or their family members. Nor has Defendant Chancellor issued new contracts to its resident that remove the Care Group charges, which are allegedly based on the staffing levels Chancellor has no intention to provide. In fact, Chancellor continues to charge residents and/or their family members for assessed levels of care it routinely and systemically does not provide.

[*Id.* at ¶¶ 45, 53]. The emphasized portions of paragraph 45 reference the alleged active misrepresentations, then describe why they were false, and then recharacterize those two foundational elements of any active fraud case -- an outright lie juxtaposed against the truth of the transaction -- as, instead and improperly, an omission/concealment claim. Paragraph 53 reemphasizes this approach. It notes Chancellor is aware of the falsity of its representations but has not told prospective residents and their families the truth, thus (and necessarily) concealing the truth. But that is not a fraud by concealment. It is a fraud by overt misrepresentation.

Plaintiffs assert various, resulting unfair or deceptive acts under the West Virginia Consumer Credit and Protection Act ("WVCCPA") as follows:

1. "The act, use, or employment by any person of any deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression, or omission, in connection with the false advertisement of any goods or services[;]"

2. "Engaging in conduct which creates a likelihood of confusion or of misunderstanding[;]"

3. "Advertising goods or services with intent not to sell them as adverted[;]"

4. "Representing that goods or services . . . have characteristics, ingredients, uses, benefits . . . that they do not have . . .[;]" and

5. "Representing that goods or services are of a particular standard, quality or grade . . . [if they are of another.]"

6

[*Id.* at ¶¶ 27, 112]; s*ee* W. Va. Code §§ 46A-6-104 and 46A-6-106; *see also* W. Va. Code § 46A-6-102(7). Plaintiffs' entire omission/concealment theory then -- as defective and inapt as it is based upon the operative pleading allegations -- rests its entire weight on the two words "concealment" and "omission" in one subsection of the WVCCPA.

On August 15, 2024, Plaintiffs renewed their Motion for Class Certification, seeking class treatment for this group:

> All individuals that entered any of the four assisted living communities alleged herein to be controlled by CSM between October 25, 2012, and October 25, 2016, whose Residency Agreement contained an arbitration provision adopting the Rules of the American Health Law Association ("AHLA").

[ECF 275 at 2].[2]

### III.

### A.    *Unfair or Deceptive Acts Standard Under the WVCCPA*

As noted, claims premised on a defendant's alleged unfair or deceptive acts are governed by the WVCCPA. To establish a WVCCPA violation of this type, *West Virginia Code* section 46A-6-106(a) requires the following elements: "(1) unlawful conduct by [a] seller; (2) an ascertainable loss on the part of the consumer; and (3) proof of a causal connection between the alleged unlawful conduct and the consumer's ascertainable loss." Syl. Pt. 5, *White v. Wyeth*, 227 W. Va. 131, 133, 705 S.E.2d 828, 830 (2010). Additionally, "[w]here the alleged deceptive conduct or practice involves affirmative misrepresentations, reliance on such misrepresentations must be proven in order to satisfy the requisite causal connection." *Id.*

---

[2] Plaintiffs note they "have modified the class period to include an end date of October 25, 2016, to simplify identifying class members and to more closely track the discovery that the parties have exchanged, and the experts have analyzed." [ECF 275 at 2 n.1].

Alternatively, "[w]here concealment, suppression or omission is alleged -- *and proving reliance is an impossibility* -- the causal connection between the deceptive act and the ascertainable loss is established by the presentation of facts showing that the deceptive conduct was the proximate cause of the loss." *Id*. at 140, 705 S.E.2d at 837 (emphasis added). "'Proximate cause' . . . [is] that cause which in actual sequence, unbroken by an independent cause, produced the wrong complained of, without which the wrong would not have occurred.'" *Id*. at Syl. Pt. 4 (quoting Syl. Pt. 3, *Webb v. Sessler*, 135 W. Va. 341, 63 S.E.2d 65 (1950)). "In other words, the facts have to establish 'but for' the deceptive conduct or practice a reasonable consumer would not have purchased the product and incurred the ascertainable loss." *Id*. at 140, 705 S.E.2d at 837.

## B.    *Class Certification Standard*

"The class action device is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *G.T. v. Bd. of Educ. of Cnty. of Kanawha*, 117 F.4th 193, 202 (4th Cir. 2024) (quoting *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006)). "The premise is that 'litigation by representative parties adjudicates the rights of all class members.'" *Id*. (quoting *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 338 (4th Cir. 1998)). A party seeking class certification must thus satisfy the four requirements of *Federal Rule of Civil Procedure* 23(a), which pertinently provides as follows:

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>
> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests

8

of the class.

Fed. R. Civ. P. 23(a). "Merely pleading compliance with these requirements is not enough; rather, 'the party [seeking certification] must present evidence that the putative class complies with Rule 23.'" *G.T.*, 117 F.4th at 202 (quoting *EQT Prod. Co. v. Adair*, 764 F.3d 347, 357 (4th Cir. 2014)).

In addition to the four Rule 23(a) criteria, a class proponent must fall under one of the three Rule 23(b) categories. Plaintiffs seek certification under Rule 23(b)(3),[3] which authorizes a class action where "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In other words, "Rule 23(b)(3) has two components: predominance and superiority." *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 319 (4th Cir. 2006). Rule 23(b)(3) sets forth the following factors to consider when deciding whether a class satisfies the predominance and superiority requirements:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties of managing a class action.

*Id*.

Plaintiffs couple their inexactitude on Rule 23(b) with similar imprecision as to Rule 23(c). In their Renewed Motion, Plaintiffs seek certification of two, putative common issues

---

[3] While Plaintiffs rely nominally on Rule 23(b)(1), (b)(2), and (b)(3), they move for certification under Rule 23(b)(3) alone. They have thus abandoned certification under the other two provisions. *Compare* ECF 57 ¶¶ 97-107 *with* ECF 295.

under the Rule 23(c)(4) "issue certification" category. Rule 23(c)(4) provides "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4). The issues identified in the Renewed Motion are (1) "Whether CSM staffs its West Virginia facilities only to the minimum staffing levels outlined with W. Va. C.S.R. 64-14-5.4.b instead of providing staffing sufficient to meet the collective assessed needs of the residents of its facilities[,]" and (2) "Whether CSM failed to disclose to the residents of its West Virginia facilities between 2012 and 2016 that it would not provide staffing levels sufficient to meet the collective assessed needs of its residents." [ECF 275 at 2].

Plaintiffs make no corresponding mention, however, of issue certification, Rule 23(c)(4), or the applicable legal standard thereunder, in their accompanying Memorandum of Law. [*See* ECF 295]. Plaintiffs supporting Memorandum is entirely devoid of any alternative certification request under Rule 23(c)(4) and exclusively seeks certification under Rule 23(a) and (b)(3). Inasmuch as Plaintiffs have failed to meaningfully brief the issue of alternative certification under Rule 23(c)(4), the ground is not fairly raised, and the Court declines to consider the unsupported alternative request.

Moving to the more general standards applicable, a district court has "broad discretion in deciding whether to certify a class . . . ." *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 (4th Cir. 2001) (quoting *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996)). That discretion, however, "must be exercised within the framework of Rule 23." *Id.* "The party seeking class certification bears the burden of proof." *Id.* (citing *Int'l Woodworkers of Am. v. Chesapeake Bay Plywood Corp.*, 659 F.2d 1259, 1267 (4th Cir. 1981)). When evaluating whether class certification is appropriate, the Court conducts a "rigorous analysis" of the facts and arguments offered in support of class certification, which often "entail[s] some overlap with the merits of the

plaintiff's underlying claim." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011). The Court may not, however, "engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). Rather, "[m]erits questions may be considered to the extent -- but only to the extent -- that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.*; *see also Thorn*, 445 F.3d at 319 (internal quotations and citations omitted) (explaining courts "must take a close look at the facts relevant to the certification question and, if necessary, make specific findings" relevant to certification "even if the issues tend to overlap into the merits of the underlying case.").

### 1.        Commonality and Predominance

The Rule 23(a)(2) commonality factor requires there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Although the rule is phrased in terms of common questions, '[w]hat matters to class certification is . . . the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation.'" *G.T.*, 117 F.4th at 202 (quoting *Wal-Mart*, 564 U.S. at 350). "A single common question will suffice, but it 'must be of such a nature . . . that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Id.* "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." *Id.* (internal quotations omitted). "It is not enough that the class members have all suffered a violation of the same provision of law." *Id.* "Rather, all class members' 'claims must depend upon a common contention' that is capable of classwide resolution." *Id.* (quoting *Wal-Mart*, 564 U.S. at 350). Simply put, "[a] question is not common . . . if its resolution 'turns on a consideration of the individual circumstances of each class member.'" *Thorn*, 445 F.3d at 319 (quoting 7A Charles

Allen Wright *et al.*, *Federal Practice and Procedure* § 1763 (3d ed. 2005)). "When determining whether commonality exists, the court must examine the precise nature of the class members' underlying claims." *Jonathan R. v. Justice*, 344 F.R.D. 294, 304 (S.D. W. Va. 2023) (citing *Parsons v. Ryan*, 754 F.3d 657, 676 (9th Cir. 2014)). "This assessment requires the court to identify the elements of the class members case-in-chief." *Id*. (cleaned up) (internal citations and quotations omitted).

The predominance requirement of Rule 23(b)(3) "is similar to but 'more stringent' than the commonality requirement of Rule 23(a)." *Thorn*, 445 F.3d at 319 (internal citations omitted). Where commonality "requires little more than the presence of common questions of law and fact[,]" predominance, as mentioned, "requires that questions of law or fact common to the members of the class predominate over any questions affecting only individual members." *Id*. (internal citations and quotations omitted). Predominance thus "'tests whether the proposed class[] [is] sufficiently cohesive to warrant adjudication by representation.'" *Id*. (quoting *Gariety v. Grant Thorton, LLP*, 368 F.3d 356, 362 (4th Cir. 2004)).

This matter begins and ends with the commonality and predominance inquiries required by Rule 23(a)(2) and (b)(3). As a threshold matter, despite litigating this case for eight years as an alleged violation of section 46A-6-106(a) of the WVCCPA under the primary theory that CSM engaged in deceptive conduct by overt misrepresentations and misleading statements regarding the way it staffs its facilities, Plaintiffs veer sharply by now principally contending -- presumably to obtain certification -- that their claims sound only in an omission theory of liability. The effect of this rather radical end run would, if permitted, relieve Plaintiffs of proving the individual reliance requirement mandated by the Supreme Court of Appeals of West Virginia in *White* for section 46A-6-106(a) claims sounding in deceptive conduct by affirmative

misrepresentations.

This stark course correction is best evidenced by the allegations, set forth earlier, in the Second Amended Complaint, along with the manner in which Plaintiffs have consistently characterized and represented their allegations throughout this marathon litigation. As noted, the crux of Plaintiffs' case is that CSM falsely represents it uses its Resident Assessment System to determine staffing levels at its facilities but, instead, only uses the assessment data to determine the amount of money it will charge its residents and staffs its facilities based solely on "predetermined labor budgets designed to meet corporate profit objectives," which has purportedly led to systematic understaffing. [ECF 57 at ¶ 11]. Specifically, Paragraph 20 of the Complaint alleges as follows:

> In form admission contracts entered into with each resident, [CSM] promises to provide the assistance required and specified by the resident assessment and which corresponds to that resident's assessed care needs. [CSM] bases its monthly charges for these "Personal Service and Care" needs on the staff time necessary to deliver those personal care services. The reasonable consumer expects that [CSM] will use its Resident Assessment and the Personal Care Plans generated by it, not only to charge for assessed level of care, but also to determine and actually provide staffing levels sufficient to deliver the level of care assessed by [CSM] and paid for by the resident. In addition, the reasonable consumer expects that [CSM] will have in place corporate policies and operating procedures that ensure that [CSM] secures the amount of staff time it has determined is necessary to meet the aggregate needs of [CSM's] residents as determined by the Resident Assessment System.

[*Id*. at ¶ 20]. The Complaint goes on to identify those uniform, "affirmative misrepresentations" set forth by CSM in its standard, uniform contracts with each resident. [*See id*. at ¶¶ 34-40].

Paragraph 34, for instance, alleges CSM affirmatively "represents to residents that it will use its Resident Assessment System to determine and then provide the level of care that [CSM] has itself decided is necessary to provide the services and care for which its residents are paying." [*Id*. at ¶ 34]. Plaintiffs further allege CSM "reinforces the misleading representation that its staffing will be based on residents needs through the use of its Resident Assessment System by

promising to periodically re-evaluate residents' health to update the Personal Service Plan." [*Id.* at ¶ 38]. Plaintiffs also identify standard letters sent by CSM to its residents "at various times during the Class Period," which provided notice of rate increases such as "staff costs to 'take care of [their] senior living needs.'" [*Id.* at ¶ 39]. Plaintiffs contend, however, "[o]n information and belief, [CSM] did not increase staffing levels despite the clear representation that it would do so." [*Id.*].

Additionally, in Paragraphs 41 through 44 of the Complaint, Plaintiffs allege CSM utilizes its marketing materials to "reinforce[] the misrepresentations and misleading statements made in every contract that its assisted living facilities use [CSM's] Resident Assessment System and the Personal Service Plan levels of care generated by it to determine and provide the necessary levels of staffing." [*Id.* at 41]. While the Court recognizes the Complaint also nominally includes allegations of concealment in Paragraphs 45-53, that concealment theory is, as noted, a thinly disguised branch in the affirmative misrepresentation tree at the core of this litigation. CSM appears to recognize as much:

> *Contrary to the express and implied representations in its form contract and other uniform written statements*, [CSM] does not use the Resident Assessment System or assessed Personal Service levels of care in setting or providing facility staffing, but instead determines staffing based on labor budgets designed to meet corporate profit objectives. [CSM] conceals these material facts from its residents, their family members and the general public.

[*Id.* at ¶ 45 (emphasis added)]. Again, CSM's alleged concealment regarding how it staffs its facilities is merely the inverse of the affirmative misrepresentation it purportedly makes in its form admission contracts that it uses the Resident Assessment System to do so. Reduced to its essence then, Plaintiffs contend CSM misrepresented that residents' assessed care needs would be met through staffing and thus omitted the fact that this was false given that residents' assessed needs

are not used for staffing purposes. Simply put, the alleged "omission" is nothing more than CSM's failure to state the truth of the matter misrepresented.

Furthermore, when Plaintiffs initially moved for Class Certification on October 23, 2023, they again emphasized and focused on CSM's purported misrepresentations and misleading statements made in both its uniform residency agreements and marketing materials. [*See* ECF 177-41 at 6-7]. In support of class certification, Plaintiffs made statements such as "CSM's *misrepresentations* regarding its staffing practices and ability to meet its residents' care needs were uniformly inscribed within each Agreement. Thus, . . . Plaintiffs and the class . . . relied on the same *representations*, making clear that questions of fact and law predominate." [*Id*. at 18 (emphasis added)]. Plaintiffs further asserted they and the class "paid sums of money in Community Fees and Personal Care Fees based on the *misrepresentation* that the assisted living facilities they entered would be sufficiently staffed," but "due to CSM's *misrepresentations*, they ended up paying to enter 'tainted' facilities that were understaffed." [*Id*.]. Simultaneously, however, Plaintiffs alluded to a concealment or omission theory of liability, which, again, appeared to be merely one more predicate of CSM's purported active misrepresentations. [*See, e.g.*, *id*. at 12 ("There are additional [common] questions to be answered . . . includ[ing]: (1) whether CSM, through its marketing materials, website, form contracts and other means, misleads its residents, *or conceals material facts*, regarding its staffing practices . . . (2) whether CSM's misleading statements *and/or omissions* about its staffing practices constitute deceptive acts?") (emphasis added)].

Plaintiffs' initial Motion for Class Certification was ultimately denied without prejudice, subject to refiling after issues arising with Plaintiffs' expert were resolved. [*See* ECF 263]. It was in that Order the Court directed the parties, in their renewed class certification

briefings, to "devote particular attention to whether the alleged deceptive conduct constitutes an affirmative misrepresentation or, instead, an omission, along with the impact thereof on the certification question." [*Id*. at 2]. This directive doubtless raised the specter for Plaintiffs that their continued, studied, and deliberate reliance upon the alleged affirmative misrepresentation theory likely would doom their certification request. In their renewed Motion for Class Certification, they thus insist their WVCCPA claim is solely "rooted in CSM's material omissions," relieving them of presenting any evidence of individual reliance.[4] [ECF 295 at 3]. In fact, Plaintiffs now rather remarkably contend it is CSM that "has consistently conflated West Virginia's separate and distinct requirement of showing reliance for affirmative misrepresentation claims[,] which is not required for omissions claims[,] which do not require such individualized inquiries," despite that it is in actuality Plaintiffs themselves who have consistently focused on CSM's active misrepresentations from the outset. Notably absent from Plaintiffs' renewed motion are the allegations and evidence related to the uniform misrepresentations purportedly made by CSM in its standard form contracts and marketing materials that were once contained in their initial motion for certification and which formed the bulk of the allegations in their Complaint.

Again, Plaintiffs have consistently and repeatedly alleged CSM affirmatively misrepresents in its uniform admissions contracts and advertising that it staffs its facilities based on the assessed needs of its residents identified through the Resident Assessment System. Merely alleging CSM omitted and/or concealed that it does not use the assessment data for staffing purposes does not transform this case into one sounding in an omission theory of liability when

---

[4] Despite the insistence that their claim is rooted solely in CSM's omissions, Plaintiffs yet contend in their Renewed Motion for Class Certification that CSM falsely "*represented* to its residents that the results of their needs assessments would drive how the facility would meet their needs," and instead "used a basic template for purposes of staffing to the minimum requirements [under West Virginia law] and then consistently fell below the staffing minimums." [ECF 295 at 15 (emphasis added)].

the omission alleged is nothing more, again, than the mirror image of the asserted misrepresentation. Indeed, "[w]hile every misrepresentation has an omission as its counterpart (i.e. an omission to truthfully represent the matter at issue), Plaintiff[s] cannot through artful pleading turn a misrepresentation of fact into an omission." *Bear v. Oglebay*, 142 F.R.D. 129, 133 (N.D. W. Va. 1992). It is that which Plaintiffs have attempted to do here. The Court thus declines to relieve Plaintiffs of proving the individual reliance requirement mandated by *White* for section 46A-6-106(a) claims sounding in active misrepresentations, inasmuch as the gravamen of the claim pled in the Complaint is a misrepresentation, not omission or concealment.

Moreover, it is also noteworthy our Court of Appeals has recognized -- at least in the context of securities fraud actions -- that "[c]ourts often infer reliance when a plaintiff alleges that the defendant made a material omission . . . ." but "[n]o presumption of reliance exists . . . when the plaintiff alleges both nondisclosure and positive misrepresentation instead of only nondisclosure." *Banca Cremi, S.A. v. Alex Brown & Sons, Inc.*, 132 F.3d 1017, 1028 n.13 (4th Cir. 1997); *see also Morris v. Wachovia Securities, Inc.*, 223 F.R.D. 284, 301 (E.D. Va. 2004) (concluding "because the [Complaint] alleges misrepresentations or, at best, a combination of misrepresentation and omission, reliance cannot be presumed."). While this case involves a deceptive-act claim under the WVCCPA, rather than a securities fraud cause of action, the principles pertaining to the differential treatment of omissions and misrepresentations are comparable inasmuch as plaintiffs are generally relieved, in both instances, from demonstrating reliance when omissions are at issue.

But where, as here, Plaintiffs have alleged both misrepresentations and omissions -- and the latter is merely the inverse of the misrepresentation alleged -- it would be quite sensible to hold Plaintiffs to the reliance standard. If not, nearly every plaintiff alleging a deceptive act

claim under the WVCCPA could free itself from the more rigorous reliance standard by simply incanting "omission," in addition to the alleged misrepresentations, when the subject "omission" -- in its stripped-down form -- is really nothing more than the failure to state the truth of the matter misrepresented. Once tolerated, *White's* enhanced burden of proof for misrepresentation claims evaporates. And, in one motion, a key -- and demanding -- statutory proof mechanism is swept aside for something far less rigorous. The necessary omissions must surely be of a more independent nature than the one here alleged. Afterall, *White* only provides such relief "[w]here concealment, suppression or omission is alleged, *and proving reliance is an impossibility* . . ." *White*, 227 W. Va. at 140, 705 S.E.2d at 837 (emphasis added). No such impossibility exists here, given Plaintiffs' allegations that CSM misrepresented in its uniform contracts and marketing materials that it staffed its facilities based on the assessed needs of its residents. It is thus possible for Plaintiffs to demonstrate reliance on the same. They simply choose not to do so here inasmuch as it necessarily dooms their certification request.

As mentioned above, to succeed on their section 46A-6-106(a) claim, Plaintiffs must prove the following elements: "(1) unlawful conduct by [a] seller; (2) an ascertainable loss on the part of the consumer; and (3) proof of a causal connection between the alleged unlawful conduct and the consumer's ascertainable loss." Syl. Pt. 5, *White*, 227 W. Va. at 133, 705 S.E.2d at 830. Additionally, given that "the alleged deceptive conduct . . . involves affirmative misrepresentations, reliance on such misrepresentations must be proven in order to satisfy the requisite causal connection." *Id*. It is this latter requirement that collapses Plaintiffs' pursuit of class certification.

Our Court of Appeals has consistently recognized the detrimental effect analogous reliance requirements generally pose on putative class actions, most commonly in the context of

common law fraud, negligent misrepresentation, or securities fraud claims. *See, e.g.*, *Thorn*, 445 F.3d at 321 ("[I]n [class action] cases where the legal issue is similarly focused on the plaintiff's knowledge, such as the requirement that a plaintiff in a fraud claim reasonably rely on defendant's representations, we have consistently held that individual hearings are required."); *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 359 (4th Cir. 2004) ("Because proof of reliance is generally individualized to each plaintiff allegedly defrauded . . . fraud and misrepresentation claims are not readily susceptible to class action treatment, precluding certification of such actions as a class action."); *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 435 (4th Cir. 2003) ("The first reason why common issues do not predominate in Plaintiffs' [fraud and negligent misrepresentation] claims against the [defendants] is the need for individual inquiry into the issue of reliance."); *see also Basic v. Levinson*, 485 U.S. 224, 242 (1988) ("Requiring proof of individualized reliance from each member of the proposed plaintiff class effectively would have prevented respondents from proceeding with a class action, since individual issues then would have overwhelmed the common ones.").

Like common law claims for fraud and negligent misrepresentation, proof of subjective reliance is necessary for section 46A-6-106(a) claims based on affirmative misrepresentations. The individualized inquiry necessary to satisfy the reliance requirement renders Plaintiffs' WVCCPA deceptive act claim incapable of class wide resolution, inasmuch as the claim will turn on consideration of the individual circumstances of each class member. Given that proof of subjective reliance will be necessary for each member, it is apparent individualized questions will entirely consume any minimal benefits achieved by the class device. And this consideration alone precludes a finding that common issues of fact predominate.[5] Plaintiffs are

---

[5] To the extent Plaintiffs rely on *Heredia v. Sunrise Senior Living, LLC*, No. 22-55332, 2023 WL 4930840 (9th Cir. Aug. 2, 2023), in support of their assertion that the predominance

thus unable to satisfy Rule 23(a)(2) and (b)(3)'s commonality and predominance requirements, rendering class certification improper.

## IV.

Based on the foregoing discussion, Plaintiffs' Renewed Motion for Class Certification [**ECF 275**] is **DENIED**, and the following Motions are **DENIED AS MOOT**: (1) CSM's Emergency Motion to Strike Opinions Disclosed in Violation of Court's Order [**ECF 269**], (2) CSM's Motion to Seal Exhibits Attached to Emergency Motion [**ECF 271**], (3) CSM's Emergency Motion to Strike Expert Report of Cristina Flores, Ph.D., R.N. [**ECF 278**], (4) CSM's Motion to Strike References to and Reliance Upon Expert Opinions Disclosed in Violation of Court's Orders and Rule 26 in Plaintiffs' Renewed Motion for Class Certification [**ECF 286**], (5) CSM's Motion to Strike Expert Report of Cristina Flores, Ph.D., R.N. [**ECF 287**], (6) CSM's Motion to Strike Corrected Supplemental Expert Report of Jeffrey West [**ECF 289**], and (7) CSM's Motion for Evidentiary Hearing on Plaintiffs' Renewed Motion for Class Certification [**ECF 292**].

---

requirement is satisfied, their reliance is misplaced. In *Heredia*, the district court certified plaintiffs' similar claims against senior living facilities under California consumer protection laws. Defendants appealed certification on the basis "that the predominance requirement was not satisfied because there [was] a need for individualized inquiries into what class members were told about [defendants'] staffing and whether class members relied on any of [defendants'] alleged misrepresentations." *Id.* at *2. The Ninth Circuit rejected defendants' contentions and concluded "[t]he district court reasonably determined that all class members were exposed to substantially similar, material representations about [defendants'] staffing through their residency agreements, and thus, plaintiffs could invoke *a rebuttable inference of classwide reliance under California law.*" *Id.* (emphasis added). Critically, Plaintiffs here have not pointed to, nor is the Court aware of, any similar "rebuttable inference of class wide reliance" available under the WVCCPA or West Virginia law. *Heredia* is thus inapposite.

Plaintiffs are **ORDERED**, no later than March 1, 2025, to inform the Court in writing whether they intend to pursue the individual actions alone or, instead, pursue some other permissible course of action pursuant to the governing rules of procedure.

The Clerk is directed to transmit copies of this written opinion and order to all counsel of record and any unrepresented parties.

ENTER:  February 18, 2025

Frank W. Volk
Chief United States District Judge